**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| MARK LLOYD, | : | Case No. 1:18-cv-32 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| THE PROCTER & GAMBLE DISABILITY | : | |
| BENEFIT PLAN, et al., | : | |
| | : | |
| Defendants. | : | |

---

**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD (DOC. 28), GRANTING IN PART PLAINTIFF'S
MOTION FOR JUDGMENT ON THE RECORD (DOC. 29), ORDERING THE
PAYMENT OF PARTIAL DISABILITY PAYMENTS FROM JANUARY 16, 2017
THROUGH JANUARY 28, 2017, AND TERMINATING ACTION**

---

This ERISA case is before the Court on the parties' cross-motions for judgment on the administrative record and their responsive memoranda. (Docs. 28, 29, 31-32.) For the reasons discussed below, the Court **DENIES** Defendants' motion and **GRANTS IN PART** Plaintiff's motion.

### FACTS

Plaintiff Mark Lloyd worked as an IT Systems/Solutions manager at the Procter & Gamble Company ("P&G") from June 19, 2000 until January 27, 2017, when he was terminated. He brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover benefits allegedly due to him under the terms of P&G's disability insurance plans. Plaintiff specifically challenges the denial of two applications for benefits.

In his first claim, Plaintiff alleges that the P&G Disability Committee improperly denied his December 1, 2015 application for short term disability ("STD") and long-term disability ("LTD") benefits, referred to as Claim Number CF24KW. In his second claim, Plaintiff alleges that his January 27, 2017 application for STD and LTD benefits, referred to as Claim Number CF2BHF, was improperly denied.

### A.   P&G's Disability Insurance Plans

Plaintiff was enrolled in three disability plans through P&G: The Procter & Gamble Disability Benefit Plan, The Procter & Gamble Long-Term Disability Allowance Policy Plan, and The Procter & Gamble Optional Disability Insurance Plan. Plaintiff refers to these three plans collectively as "the Plan," as does the Court for purposes of this Order.

The P&G Disability Committee, which during the relevant period was called the Board of Trustees, (hereinafter the "Committee") is the Plan's named fiduciary and is responsible for reviewing and making all final appeal decisions concerning benefit claims. The Plan expressly states that the Committee "has all the power, responsibility, and discretionary authority necessary to carry out the administration of the Plan in a uniform manner that is consistent with the terms of the Plan and solely for the benefit of the Plan's participants, including, but not limited to the power and discretionary authority to make findings of fact and interpret Plan terms." (Doc. 25-3 at PageID# 3645, 3680 & 3719.)

Local or corporate review boards process initial claims for benefits. An outside company called Genex Services ("Genex") provides medical claims administration

services for the review boards. Genex gathers pertinent medical information, conducts an initial review, and makes recommendations to the review board as to whether a claim should be approved or denied.

Under the Plan, a participant may receive benefits for a "partial disability" for up to a maximum of 52 weeks. The Plan defines "partial disability" as follows:

> Partial disability is a mental or physical condition resulting from an illness or injury because of which the participant is receiving medical treatment and cannot perform the regular duties of his or her current job but can perform other useful roles at the same Company site or at other jobs outside the Company. Thus, a partially disabled participant is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

(Doc. 25-3 at PageID# 3731.)

In order to qualify for continuing disability benefits beyond 52 weeks ("LTD Benefits"), a participant must have a "total disability." A "total disability" is defined as follows:

> Total disability means a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the participant is receiving regular recognized treatment by a qualified medical professional. Usually, total disability involves a condition of such severity so as to require care in a hospital or restriction to the immediate confines of the home.

(*Id.*)

The Plan provides that it is the participant's burden to establish whether he is partially or totally disabled. (*Id.* at PageID# 3835.) "Partial disability" and "total disability" must be based on objective medical evidence. (*Id.*)

**B.** **Plaintiff's December 1, 2015 Application for Benefits**

From as early as 2000, Plaintiff has suffered from gastrointestinal symptoms, including intermittent constipation, bloating, distension and discomfort. (Doc. 22-2 at PageID# 309). On September 9, 2014, Plaintiff first applied for STD benefits under the Plan and received benefits from September 8, 2014 through October 19, 2014. (Doc. 22-5 at PageID# 1068.) On October 20, 2014, Plaintiff returned to work.

A few months later, Plaintiff again sought STD benefits related to these conditions, with a relapse date of January 23, 2015. (Doc. 25-1 at PageID# 2940.) On March 20, 2015, the Plan denied benefits to Plaintiff finding there was "insufficient objective medical information provided to support disability." (*Id.*) Plaintiff appealed the denial, which was upheld on October 30, 2015. (*Id.* at PageID# 2937-39.)

On December 1, 2015, Plaintiff again submitted a claim for STD and LTD benefits as a totally disabled participant, claiming disability as of November 3, 2015. (PageID# 1058.) On January 19, 2016, the Corporate Disability Reviewing Board issued its determination that the objective clinical documentation did not support total disability. On February 26, 2016, Plaintiff administratively appealed and, on April 8, 2016, the Committee upheld the decision. (Doc. 25-2 at PageID# 3297-3300.) Plaintiff's first claim in this case is for review of the denial of his December 1, 2015 application for benefits.

**C.** **Plaintiff's January 27, 2017 Application for Benefits**

On January 27, 2017, the same day that Plaintiff's employment was terminated, he filed an application for benefits, which was assigned a new claim number – Claim No. CF2BHF. (Doc. 22-1 at PageID# 81.) Plaintiff again sought benefits as a totally

4

disabled participant premised on an onset date of January 16, 2017. (*Id.*) On March 10, 2017, the Corporate Disability Reviewing Board issued an initial adverse determination of that claim. On or about September 7, 2017, Plaintiff appealed and, on October 20, 2017, the Committee once again upheld the adverse determination. (Doc. 22-1 at PageID# 173-87; Doc. 24-3 at PageID# 2384-86.)

## LEGAL STANDARD

The Court's review of Plaintiff's claims is limited to the administrative record for the benefit determinations. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). In addition, because the plan administrator in this case had discretionary authority to determine benefits, the Court must apply "the highly deferential arbitrary and capricious standard" in reviewing the denial of Plaintiff's claims for benefits. *Wilkens v. P&G Disability Benefit Plan*, No. 1:11-cv-521, 2013 U.S. Dist. LEXIS 108762 (S.D. Ohio Aug. 2, 2013.) This is "the least demanding form of judicial review." *Davis v. Ky. Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989). "An outcome is not arbitrary or capricious where the evidence supports a reasoned explanation for that particular outcome." *Kirkham v. Prudential Ins. Co. of Am.*, No. 1:09-cv-733, 2011 U.S. Dist. LEXIS 53690, at *9 (S.D. Ohio Mar. 11, 2011) (citing *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998)).

Arbitrary and capricious review is deferential, but it "is no mere formality." *Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006). The Court must review the plan administrator's decision in light of the record before it, including "[t]he quality and quantity of the medical evidence; the existence of any conflicts of interest;

5

whether the Administrator considered any disability finding by the Social Security Administration; and whether the Administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (internal quotation marks omitted). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

Plaintiff maintains the burden of showing his entitlement to benefits under the Plan. *Rose v. Hartford Fin. Servs. Grp.*, 268 F. App'x 444, 452 (6th Cir. 2008) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006)).

## ANALYSIS

Defendants argue the Plan's decisions must be upheld under the highly deferential arbitrary and capricious standard of review. Alternatively, they argue that Plaintiff's claims are both procedurally barred. Plaintiff contends that, even under the arbitrary and capricious standard, the denial of benefits must be overruled.

### A. Plaintiff's Claims Are Not Procedurally Barred

Before turning to the administrative record, the Court considers the argument that Plaintiff's claims are procedurally barred. The Plan contains a two-year limitations period for filing suit on a denied claim, which accrues from the time of the initial adverse determination. (Doc. 25-3 at PageID# 3841-42.) As Defendants note, contractual limitations in a disability insurance plan are enforceable. *See Heimeshoff v.*

6

*Hartford Life & Acc. Ins. Co.*, 571 U.S. 99 (2013).

Defendants argue that Plaintiff was required to bring this lawsuit within two years of March 20, 2015, the date when he received the first denial of a claim for disability benefits. Defendants argue that all of Plaintiff's claims must be construed as subject to that initial denial based on the following provision:

> If a Participant who becomes totally disabled and then later returns to work should:
>
> a.  suffer a relapse of a previous disability that caused absence while a Participant during the preceding 52 weeks, he or she shall again be eligible for disability benefits from this Plan as if the periods of disability were continuous.
>
> b.  suffer a relapse of a previous disability that caused previous absence more than 52 weeks after the end of the previous disability, the relapse will be considered as a separate disability not subject to the provision of subsection a., above. With respect to this previous disability, a Participant receiving Partial Disability benefits shall not be considered as having returned to work.

(Doc. 25-3 at PageID# 3836.) Defendants interpret this language to mean that any application for benefits that is not separated by a continuous 52-week period of work from a previous application is treated as a single disability claim. Thus, Defendants argue, Plaintiff's subsequent applications for benefits on December 3, 2015 and January 27, 2017 did not constitute new claims. Instead, they were a continuation of Plaintiff's earlier claim for disability benefits, which was denied on March 20, 2015.

In response, Plaintiff argues that Defendants are estopped from asserting the statute of limitations based on the representations in their denial letters. The Board's letter denying his December 1, 2015 application for benefits stated that "the Applicable

Limitations Period will end on January 19, 2018 which is the second anniversary date of this letter." (Doc. 22-5 at PageID# 1051.) Likewise, with respect to Plaintiff's January 27, 2017 application, the Board's denial letter stated that "the Applicable Limitations Period will end on March 10, 2019." (Doc. 22-2 at PageID# 533.)

Promissory estoppel claims are viable under ERISA. *Haviland v. Metro. Life Ins. Co.*, 730 F.3d 563, 567 (6th Cir. 2013). The elements of a promissory estoppel claim are:

> (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting estoppel must reasonably or justifiably rely on the representation to his detriment.

*Id.* at 567-68 (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998)). "Principles of estoppel ... cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Sprague*, 133 F.3d at 404.

Here, Plaintiff asserts facts sufficient to collaterally estop Defendants' argument for application of the statute of limitations. Plaintiff reasonably relied on Defendants' statements regarding the applicable limitations period. Moreover, the provision relied upon by Defendants is not clear and unambiguous. Defendants interpret the term "disability" to mean the employee's last ***application*** for disability benefits, rather than the last time that the employee was actually found to be disabled under the Plan. Defendants also interpret the provision to require that the employee ***work*** 52 continuous weeks after a disability in order to apply for benefits based on a new

8

disability, when it could also be construed to require merely the passage of 52 weeks.

Not surprisingly, Plaintiff construes the term disability to mean a condition recognized as a disability under the Plan. Plaintiff was recognized as suffering from a disability under the Plan only once in the record—from September 8, 2014 through October 19, 2014. Applying the parties' competing interpretations of the provision results in significantly different outcomes. The Court need not decide which interpretation is correct as a matter of law, however, to find that the provision is, at least on its face, ambiguous. As a result, Plaintiff was entitled to rely on Defendants' representations regarding the applicable statutes of limitations for his claims. They are not procedurally barred.

**B.** **Whether the Plan Acted Arbitrarily and Capriciously in Denying Plaintiff's Applications for Benefits**

**1.** **Plaintiff's December 1, 2015 Application for Benefits**

The Plan did not act arbitrarily and capriciously in denying Plaintiff's December 1, 2015 application for benefits. Rather, after a review of the application, it determined that there was a lack of objective medical information to support a finding of partial or total disability. The Plan noted, for example, that the documentation from Plaintiff's family physician, Dr. Kanodia, "described [him] as appearing well with no acute distress and with no documented clinical abnormalities." (Doc. 25-2 at PageID# 3297.) Additionally, the Plan noted that "intermittent ER visits have repeatedly resulted in negative findings with no evidence of bowel obstruction." (*Id.* at PageID# 3299.)

The Plan also considered the additional information that Plaintiff submitted on

appeal, including the documentation of Plaintiff's medical condition from Dr. Kirby at the Cleveland Medical Clinic. (*Id.* at PageID# 3298-99.) In reviewing Dr. Kirby's files, the Plan relied on an independent review conducted by Dr. Sunil Sheth, a board-certified gastroenterologist. (*Id.* at PageID# 3299; Doc. 22-2 at PageID# 288-297.)

Dr. Sheth is Co-Director of the Pancreas Center at Beth Israel Medical Center and an Assistant Professor of Medicine at Harvard Medical School. (Doc. 22-2 at PageID# 288.) He graduated from Seth G.S. Medical College in India and completed his internship and residency in internal medicine at TN Medical College and BYL Nair Hospital and Beth Israel Deaconess Medical Center. (*Id.*) He then completed a fellowship in gastroenterology at Beth Israel Deaconess Medical Center followed by a fellowship in interventional gastroenterology at Maine Medical Center. (*Id.* at PageID# 288-89.) He is board-certified in internal medicine and gastroenterology. (*Id.* at PageID# 289.) His clinical interests include pancreatic disease, general gastroenterology, colon cancer screening, inflammatory bowel disease, therapeutic endoscopy, and celiac sprue. (*Id.*)

In reviewing the medical documentation, Dr. Sheth observed:

[Plaintiff] has seen several GI providers and more recently is seeing Dr. Donald Kirby at the Cleveland Clinic in Ohio who feels that he may have a diagnosis of chronic intestinal pseudo-obstruction. I am not in agreement with his diagnosis as will be explained later in the Analysis. From a gastrointestinal standpoint, the claimant has a combination of abdominal distention, bloating associated with fatigue, with a completely negative GI workup as outlined in my previous review dated 10/1/15 and also as will be summarized below. He has had multiple endoscopies, colonoscopies, and fructose and lactose breath tests. He has had multiple CT scans, abdominal x-rays, labs, and ER visits that have been inconclusive. He had a SmartPill motility study which was essentially

> unremarkable except for slight delay in colonic motility. Based on intermittent symptoms of abdominal distention and bloating, there is no GI impairment. There is no objective evidence of mechanical obstruction or an inflammatory disease. Hence, from a gastrointestinal standpoint, there are no restrictions or limitations.

(Doc. 22-2 at PageID# 291.)

Dr. Sheth acknowledged that Dr. Kanodia and Dr. Kirby both supported "disability" from abdominal distention, fatigue, and symptoms resembling presumed bowel obstruction. (*Id.* at PageID# 293.) Dr. Kirby had "also stated that the claimant would really like to go back to work but is not able to do so without any reason why he is not able to do so." (Doc. 22-2 at PageID# 294.) Dr. Sheth concluded, however, that the basis of Dr. Kirby's diagnosis of chronic intestinal pseudo-obstruction ("CIPO") was unclear. He explained that, due to the lack of objective medical evidence, the diagnosis was "just [Dr. Kirby's] opinion." (*Id.* at PageID# 295.) Likewise, Dr. Sheth did not credit Dr. Kanodia's opinion that Plaintiff had chronic intestinal dysmotility because he had a "completely negative workup" for the symptoms of that disorder. (*Id.* at PageID# 295.)

In the Analysis section, Dr. Sheth wrote:

> I disagree with Dr. Donald Kirby's diagnosis of chronic intestinal pseudo-obstruction. As reviewed by Dr. Michael Camilleri in his up-to-date article, and also well known in the literature, chronic intestinal pseudo-obstruction is a diagnosis made when there is evidence of obstruction without true mechanical obstruction. The claimant, on multiple occasions during acute flares, has had no evidence of bowel distention, dilated loops, or air-fluid levels. Moreover, the critical aspect of chronic intestinal pseudo-obstruction is evidence of impaired motility, which the claimant does not have, as he had an essentially normal gastric emptying study and normal SmartPill manometry. He likely has underlying mild constipation, which is improved with linaclotide. Moreover, the causes of chronic

intestinal pseudo-obstruction are either neuropathic, myopathic, or secondary to collagen vascular disease, endocrine disorders, chemotherapy, radiation therapy, or medication. None of these apply to him. He has not had a full-thickness small bowel biopsy.

Regardless of the diagnosis given for his symptoms of abdominal distention, whether it may be irritable bowel syndrome, functional GI disorder, chronic intestinal dysmotility, or even chronic intestinal pseudo-obstruction, the symptom of abdominal distention and bloating does not cause any GI impairment. There is no significant additional data since my last review of 10/1/15. Hence, my clinical opinion remains unchanged. The claimant has no impairment from a GI standpoint and, therefore, does not have any restrictions or limitations.

(Doc. 22-2 at PageID# 295.) Given his disagreement with Dr. Kirby, Dr. Sheth stated "[i]t would not be unreasonable, if necessary, to have a second GI reviewer comment on impairment." (*Id.*) The Plan did not, however, obtain a second GI reviewer's opinion. Plaintiff argues that the Plan acted arbitrarily and capriciously when it failed to seek a second opinion, as suggested by Dr. Sheth. He does not cite any authority, however, for the proposition that the Plan is required to obtain more than one qualified reviewer.

Dr. Sheth's review was thorough and presented a rational basis for the conclusion that Plaintiff was not disabled. Plaintiff objects to Dr. Sheth's analysis for several reasons, but those objections represent differences of professional opinion. It was neither arbitrary nor capricious for the Plan to accept Dr. Sheth's opinion in reaching its conclusion. There may be circumstances where a reviewing physician's analysis is so illogical or ungrounded that reliance on that analysis may be deemed arbitrary and capricious. This, however, is not one of those cases.

2.    **Plaintiff's January 27, 2017 Application for Benefits**

In Plaintiff's January 27, 2017 application for benefits, he indicated that his primary condition was CIPO with secondary conditions of chronic fatigue syndrome, fibromyalgia, slow transit constipation, abdominal distension, generalized abdominal pain and chronic fatigue.  (Doc. 22-2 at PageID# 536.)  Genex, the third-party claim processing service, reviewed the claim and concluded that the objective medical documentation did not support disability.  (Doc. 22-3 at PageID# 613.)  The Review Board then completed its review and denied the claim on March 10, 2017.  (Doc. 22-2 at PageID# 531-33.)

Plaintiff appealed the Review Board's denial and submitted additional documentation, including a support letter from Dr. Kirby.  (Doc. 22-1 at PageID# 191-94.)  He also included a "Physician's Progress Report" from Dr. Kirby that had been submitted in connection with a different disability claim.  (Doc. 22-4 at PageID# 926-29.)  Plaintiff's primary care physician, Dr. Robert Hellman, provided two reports:  a Genex Work Status form and a residual functional capacity assessment, each dated February 28, 2017.  (Doc. 22-1 at PageID# 242-48.)  Finally, Plaintiff submitted a report from an integrative medicine physician named Dr. Rene Blaha.  Dr. Blaha's report was prepared in connection with Plaintiff's Social Security insurance claim.  (Doc. 22-2 at PageID# 283.)  Along with Dr. Blaha's report, Plaintiff provided documentation showing that CIPO is a medical condition set forth in the Social Security Administration's list of "Compassionate Allowances."  (*Id.* at PageID# 448-65.)

The Plan asked Cristina Strahotin, a board-certified gastroenterologist, to

13

perform a medical review of Plaintiff's file, which consisted of over 2,000 pages. (Doc.

22-3 at PageID# 870-81.) She concluded that "a partial and temporary impairment is

supported for the timeframe of 01/16/2017 to the present on the basis of the claimant's

recurrent debilitating gastrointestinal symptoms." (*Id.* at PageID# 876.) She explained

the rationale for her conclusion—in pertinent part—as follows:

> A partial or temporary impairment is supported on the basis of the
> claimant's recurrent debilitating gastrointestinal symptoms and his
> primary gastroenterologist's opinion, Dr. Kirby, an expert in a field with
> only a handful of experts in the country, who has expressed on several
> occasions, including support letters dated February, 2016 and February,
> 2017, that the claimant is impaired, though Dr. Kirby is of the opinion that
> the claimant is totally impaired.
>
> …
>
> Of all the specialists that the claimant has seen, Dr. Kirby has the longest
> relationship with the claimant, over three years of continuity of care,
> which is paramount in all functional gastrointestinal conditions, and he
> has intimate knowledge of this claimant's symptom complex/diagnoses.
> He advocates for his patient like we all do for our patients. Aside from
> that, there are multiple office visits including Dr. Kirby's last note dated
> 8/4/17, that state that the claimant is well nourished, not in any acute
> distress, with soft abdomen, only with moderate distention, minimally
> tender diffusely to palpation, percussion, without guarding, rebound, or
> hepatosplenomegaly. The claimant's weight on multiple visits has
> remained stable and even slightly increased, (last weight on 8/4/17 was
> 207 lbs, BMI 29.98 which actually puts him in the overweight category), he
> has not had any ED visits since January, 2016 or admissions, has had some
> improvement though very little, however, despite these positive findings,
> the conclusion from Dr. Kirby is that he is still bed-bound 30% of the time
> and completely impaired. This conclusion is most likely driven by the
> claimant's extensive self-assessment diaries of symptoms and Dr. Kirby's
> knowledge of the natural history of chronic intestinal pseudo-obstruction
> (CIPO). The other supporting physicians, including PCP, Dr. Hellman,
> Dr. Blaha, and Dr. Kanodia, while they also have a long-term relationship
> with the claimant (Dr. Hellman longer than the other two providers), they
> are not specialists in the field of gastroenterology or motility disorders.
> Their notes and restriction/limitation forms rely heavily on Dr. Kirby's

assessment and appear unchanged over time though the clinical notes sometimes mention "appears well, symptoms improved," which creates an inconsistency that is detrimental to the claimant's case.

The claimant himself, though with debilitating symptoms and chronic fatigue, where most notes rate his level of energy 3-4/10, has been able to put a lot of effort into creating charts with his symptoms, laboratory data, testing to date, measurements of abdominal girth and extensive research regarding this condition, criteria for disability, and biographies/resumes of the providers treating him as well as of the reviewer, and while all of this is commendable and helpful to the medical providers, it can also constitute and inconsistency with clinical notes and the self-reported symptoms. The claimant is a computer analyst and perhaps computer work would be feasible even during his bed-ridden episodes.

…

His underlying condition, CIPO, is rare, and therefore, most of the management is based on expert opinion. The claimant has reached out to other doctors, beside Dr. Kirby, also experts in the field, including Dr. Abelle and Dr. Wo from prestigious institutions, and while somewhat consistent, it reveals a slight discordance of opinions, even between experts in the field. For instance, Dr. Abelle at his institution (University of Louisville, KY) considers CIPO as a completely "disabling" condition, while Dr. Wo (Indiana University, IN) opines that only small bowel CIPO with small bowel dilation would be a completely "disabling" condition. This claimant, on multiple imaging tests does not have dilated small bowel, though his intra-operative evaluation dated May, 2014 revealed intermittently dilated loops of bowel, which were not biopsied, so not clear cut.

…

The claimant wrote a counterargument letter to Dr. Sheth's report [the report written in consideration of Plaintiff's December 1, 2015 application], stating that this was a biased report, not "independent" as it was paid by Genex via P&G and Dr. Sheth was under qualified to conduct such review. Moreover, he goes to say that "while unlikely unstated, he knows that he will not be asked for future reports if he finds too many participants disabled." This is a fundamental error as we all practice medicine following an ethical code where patient care comes first. Dr. Sheth, like Dr. Kirby, provided a medical opinion based on the same objective evidence and literature, and though completely different, it

underscores the controversy that can occur in rare disorders.   In
conditions like CIPO, the management is entirely based on expert opinion
rather than guidelines.   As noted above, two other experts in the field
have a slightly different opinion about the impairment caused by CIPO.

…

I recommend modifications such as working from home, limited hours,
less responsibilities requiring maximal concentration, more lenience for
those days where he can only lay in bed, close proximity to a bathroom,
and frequent bathroom breaks are reasonable to attempt.  I think that all
these issues should be reevaluated in six month from this report and close
communication with Dr. Kirby through this process is key.

(Doc. 22-3 at PageID# 876-78.)

Based on the Court's review of the record, Dr. Strahotin's report presents an

evenhanded and reasonable analysis of the opinions, reported symptoms, and other

medical information in Plaintiff's file.   A person with CIPO suffers from the same

symptoms as someone who has been diagnosed with an intestinal obstruction.   An

intestinal obstruction, however, can be confirmed through objective medical tests.

CIPO cannot.  As a result, a treating physician must rely on a subjective assessment of

the patient's self-reported symptoms and the medical information that can be gleaned

through available clinical tests.  And, as Dr. Strahotin observed, reasonable experts in

the field have reached different conclusions regarding the level of disability caused by

CIPO.  Dr. Strahotin's finding that Plaintiff was partially disabled was rational in light

of the complete file, and especially the additional documentation submitted in support

of his appeal.

On October 20, 2017, however, the Plan issued a letter denying Plaintiff's appeal

and confirming the denial of his application for benefits.  (Doc. 24-3 at PageID# 2384-

86.)   In doing so, the Plan noted the documentation indicating Plaintiff was experiencing mild symptoms and stated its consideration included "an independent review" by a board-certified gastroenterologist (Dr. Strahotin) who determined Plaintiff would be able to work with limitations.   It then noted the following clinical documentation:

> There is no record of emergency room visits or hospitalizations since January 2016.  The January 19, 2017, office visit notes from his medical provider, Dr. Donald Kirby, documented that Mr. Lloyd had normal bowel sounds, moderately distended, and minimally tender diffusely to percussion as well as palpation.  The February 10, 2017, office visit notes from his medical provider, Dr. Robert Hellman, documented that his abdomen was soft, some distention, mildly tender, no guarding, no masses, and no organomegaly[.]  The February 27, 2017, office visit notes from his medical provider, Dr. Anup Kanodia, documented that he was in no distress and appeared well.

(Doc. 24-3 at PageID# 2386.)  After reciting the above notes, and despite Dr. Strahotin's partial disability finding, the Plan concluded that Plaintiff's symptoms "are intermittent and do not constitute a disabling impairment, either as Partially or Totally Disabling, as defined by the Plan." (*Id.*)

Here, the Plan's ultimate conclusion cannot be reconciled with the overwhelming evidence, including its own specialist's review, that Plaintiff's intermittent episodes of pseudo-obstruction were partially disabling.  If Plaintiff's application were based on the same evidence as his previous application, then the denial of benefits would have been understandable.  In previous applications, Plaintiff did not present sufficient evidence to compel a finding that he suffered from a partially or totally disabling impairment.  There was room for professional disagreement, as evidence by Dr. Sheth's report.  In

support of his final application, however, Plaintiff convincingly demonstrated a partial impairment. The question, therefore, is whether the Plan presented a rational basis for its determination he had no impairment whatsoever.

The Plan ostensibly considered the most recent clinical notes and opinions that Plaintiff submitted, as suggested by the excerpt above, but it highlighted only those portions of them supporting its denial decision. For example, the Plan credited Dr. Kirby's office visit notes—which included normal bowel sounds and moderate distention—but failed to explain why it nevertheless discounted Dr. Kirby's resolute assertion that Plaintiff's condition was totally disabling. As Dr. Strahotin acknowledged, Dr. Kirby is an expert in the diagnosis and treatment of CIPO. And, by the date of his final application for benefits, Dr. Kirby had seen Plaintiff a total of seven times. These are significant facts that the Plan failed to address in its decision to contradict Dr. Kirby's determination that Plaintiff is disabled.

The Plan also failed to address the additional documentation supporting Dr. Kirby's and Dr. Strahotin's disability findings. At his own expense, Plaintiff obtained a secondary review of his file by Dr. C. Prakash Gyawali, a gastroenterologist at Washington University in St. Louis, Missouri. Dr. Gyawali's review was consistent with a partial disability finding, in that he agreed that "there are elements in his story that might suggest intermittent episodes of pseudo-obstruction, manifesting as abdominal bloating and distension." (Doc. 22-2 at PageID# 309.) He noted that the episodes had been increasing in frequency but had stabilized in recent months. (*Id.*)

The documentation from three other treating physicians also supported a

partial disability finding.  Dr. Hellman, Plaintiff's primary care physician; Dr. Kanodia, an integrative medicine specialist; and Dr. Blaha, also an integrative specialist, all found that Plaintiff was unable to work due to a combination of CIPO, fibromyalgia and chronic fatigue.  (*See* Doc. 22-1 at PageID# 242-62, 264-69, and Doc. 22-2 at PageID# 283.)  Dr. Blaha also added food sensitivities to the list of conditions.  (*Id.* at PageID# 283.)  As Dr. Strahotin noted, none of these physicians are experts in CIPO or intestinal motility disorders so their diagnoses in this regard appear to rely heavily on Dr. Kirby's treatment and Plaintiff's self-reported case history.  Nonetheless, in light of the combined weight of all these opinions, the Plan's explanation for its decision should have accounted for why it disagreed with their conclusions, even though it selectively relied on their office visit notes.

In light of all the above, the Plan acted arbitrarily and capriciously in finding that Plaintiff was not partially disabled as of January 16, 2017.  Plaintiff argues, however, that a total disability finding was warranted because the restrictions suggested by Dr. Strahotin had already been attempted and failed.  Plaintiff argues that the Plan acted arbitrarily and capriciously when it failed to ask Dr. Strahotin if her opinion on Plaintiff's disability status would be different based on Plaintiff's work history.

In response, the Plan asserts that it was not necessary to ask Dr. Strahotin to supplement her review.  She was reviewing the 2017 claim.  Plaintiff is referring to a period two years earlier than the period relevant to that claim.  Moreover, in February 2016, Plaintiff began taking domperidone and experiencing an improvement in his condition.  Consistent with this view, Dr. Strahotin "disagree[d] with Dr. Kirby

regarding Mr. Lloyd's level of impairment" and opined that his condition "is significantly better since the initiation of Domperidone." (Doc. 22-3 at PageID# 894.) She further opined there was "not enough objective information to conclude that the claimant is unable to perform [work] in any capacity." (*Id.* at PageID# 893.)

The Court agrees that the Plan was not required to ask Dr. Strahotin about the effect of Plaintiff's work history on her disability finding. Her review included sufficient information for her to make a reasoned determination of his work capacity during the period relevant to the claim. The existence of contradictory information does not, in itself, make the administrator's decision arbitrary and capricious. *Hammond v. Procter & Gamble Health and Long Term Disability Plan*, No. 18-11343-RGS, 2019 US Dist. LEXIS 115105 at *3 (D. Mass. July 11, 2019).

### C.     **Plaintiff's Additional Arguments**

Plaintiff makes three additional arguments directed at the Plan's review generally, rather than its review of a specific application for benefits. The Court considers these arguments below.

### 1.     **Plaintiff's Argument that the Plan Should Have Obtained a Medical Review from a CIPO Expert**

Plaintiff argues that the Plan acted arbitrarily and capriciously in its denial of benefits because it did not obtain a medical review from a physician specializing in the diagnosis and treatment of CIPO. Under 29 C.F.R. § 2560.503-1, the Plan was required to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." Drs. Sheth and Strahotin,

not experts on CIPO, were board-certified gastroenterologists capable and qualified to conduct the reviews.  The regulations require appropriate training and expertise, not the absolute best training and expertise.  The Plan met is obligation in this regard.

### 2.  Plaintiff's Argument the Plan Failed to Meaningfully Consider the Opinions of Dr. Kirby and Other Treating Physicians

Plaintiff argues the Plan failed to give due consideration to the opinions of Dr. Kirby and three other treating physicians—namely, Drs. Hellman, Kanodia, and Blaha. This argument dovetails with Plaintiff's argument that the Plan failed to explain the basis for disagreeing with "the views of presented by the claimant to the Plan of health care professionals who have been treating him."  29 CFR 2560.503-1(g)(1)(vii)(a).  In the above analysis of the January 27, 2017 application, the Court agreed that the Plan failed to explain how its determination that Plaintiff was not disabled squared with these physicians' opinions.

The Court disagrees, however, that the medical documentation relevant to Plaintiff's December 1, 2015 application was not given due consideration.  The Plan considered the documentation from Plaintiff's treating physicians, to the extent that they were available, and explained why it followed the analysis of its reviewing physician, Dr. Sheth.

### 3.  Plaintiff's Argument that the Plan's Review was Prejudiced Because It Considered his Applications Relapse Claims

Throughout his memorandum, Plaintiff argues that his applications were not afforded an adequate review because they were considered "relapse" claims.  The record does not support this assertion.  Certainly, the reports submitted by Drs. Sheth

and Strahotin provide a thorough analysis of the complete file before each of them, respectively. In addition, due to the nature of Plaintiff's conditions, it makes sense that the review of his file would incorporate his medical history and the impact of different treatment protocols on his symptoms.

>    **D.    Appropriate Remedy**

Having determined that the Plan's denial of Plaintiff's January 27, 2017 application for benefits was arbitrary and capricious, the Court must determine the proper remedy. Generally, "courts may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). A remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Id.* at 622; *see also Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 513 (6th Cir. 2005) (concluding that where claimants have clearly established their disability, the appropriate remedy is an immediate award of benefits rather than a remand to consider previously ignored evidence). As the Sixth Circuit has warned, "[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 172 (6th Cir. 2007). Instead, "[t]hey need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Id.*

Here, the record clearly establishes that Plaintiff was partially disabled as of

January 16, 2017. Accordingly, he is entitled to disability benefits and a retroactive award is warranted. *See Haning v. Hartford Life & Accident Ins. Co.*, 140 F. Supp. 3d 654, 676 (S.D. Ohio 2015). Defendants also forfeited its right to reconsideration because it did not request it. *Id.* (citing *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 372 n. 7 (6th Cir. 2009)).

Defendants argues that the period of disability at issue on the second claim is from January 16, 2017 to January 28, 2017 because Plaintiff's employment was terminated on January 27, 2017. (*See* Doc. 31 at PageID# 3929 (asserting Plan was explicit in advising Plaintiff of the period under consideration) (citing Doc. 24-3 at PageID# 2386).) Under the Plan, P&G reserves the right to discharge any employee at any time and, if an employee is terminated for any reason, "all his or her rights or interests in this Fund and all benefits under this Plan shall terminate at once." (Doc. 25-3 at PageID# 3842.) Plaintiff contends that, in the event the Court awards benefits, "he would pursuant to P&G's policies would again have to be considered an 'employee' and the termination of his employment would in that event be nullified." (Doc. 32 at PageID# 3945, n. 5.) Plaintiff does not cite the relevant P&G policy or the authority that would empower the Court to grant this extraordinary remedy. The Court therefore will order the payment of partial disability benefits only from January 16, 2017 through January 28, 2017.

## CONCLUSION

For the reasons above, the Court **DENIES** Defendants' Motion for Judgment on the Administrative Record (Doc. 28) and **GRANTS IN PART** Plaintiff's Motion for

Judgment on the Record (Doc. 29). Specifically, the Court upholds the denial of Plaintiff's December 1, 2015 application for benefits but reverses the denial of Plaintiff's January 27, 2017 application for benefits as arbitrary and capricious. The Court **ORDERS** that Defendants pay to Plaintiff partial disability benefits for the period from January 16, 2017 through January 28, 2017. This case shall be **TERMINATED** on the Court's docket.

      **IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND
